# In the United States Court of Federal Claims

No. 19-1714C
(Filed: October 16, 2023)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PLATINUM SERVICES, INC.,

                        *Plaintiff*,

v.

THE UNITED STATES,

                        *Defendant*,

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Anthony J. Marchese,* Washington, DC, for plaintiff. *Carol L. O'Riordan*, of counsel.

    *Stephanie A. Fleming*, Trial Attorney United States Department of Justice, Commercial Litigation Branch, for defendant, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Eric P. Bruskin*, Assistant Director, Assistant Director, and *Aaron Pound*, General Counsel, General Services Administration, of counsel.

## OPINION

BRUGGINK, *Judge*.

    This is the third in a series of five lawsuits brought by Platinum Services, Inc. ("Platinum") seeking payment for transportation of household goods, and associated services, for the Department of Defense ("DOD"). Pending are cross-motions for summary judgment. We disposed of similar motions by opinion in 18-1539 and by order in 20-456. The facts in this suit are similar to those in 18-1539 but not controlled by the outcome of that suit. As explained below, for the vast majority of these shipments, because plaintiff effectively cancelled its tenders before acceptance by DOD, no

contract was formed. Trial will be necessary to determine the value of the services rendered.

## BACKGROUND

I. Factual History

We presume familiarity with our opinion issued in case No. 18-1539 on August 17, 2023. We thus need not recite the general background of how DOD ships household goods ("HHGs") for service members via the direct procurement method ("DPM") pursuant to the Defense Transportation Regulation ("DTR").[1] At issue in this case are 1,311 shipments for which Platinum has not been paid. The principal dispute, though there are others, concerns the price term agreed to, or not, by the parties. Almost all of the government bills of lading ("GBLs") reference a tender (offer) from Platinum to move HHGs from origin to destination at a particular rate. Five shipments, however, were originally to be moved by another transportation service provider ("TSP") but later reassigned to plaintiff. Of those, two had correction notices issued by the government to effect the change in TSP but did not reference any Platinum tender. Two others were re-tendered by DOD and did include a Platinum tender. The fifth has not, as of the filing of plaintiff's motion for summary judgment, been the subject of a correction notice from the government, but Platinum did accept the work and perform it. For each shipment at issue, the tender referenced on the GBL had expired or had been cancelled at the national level by Platinum prior to performance.

A separate issue concerns 12 shipments for which Platinum billed the government for local storage charges at the destination point. These shipments were all to a military installation in Tracy, California. In each instance, defendant was unable to accept the HHGs upon their arrival, and Platinum thus arranged for the goods to be stored locally until they could be delivered to the government. Delivery was delayed for several days in one instance and up to several weeks in another. Platinum billed the government for local storage fees per the rates contained in its active tenders on file with DOD.

---

[1] That background is available at 2023 WL 5313531 (Fed. Cl. Aug. 17, 2023) (pending publication in the Federal Claims Reporter).

Storage fees aside, the principal dispute concerns the effect of Platinum's cancellation of tenders via DOD's Global Freight Management ("GFM") system. Plaintiff submitted tenders to DOD via its central GFM system and to the local shipping offices via email or hard copy. The local shipping offices relied on the offers sent directly to them and issued the 1,311 contested GBLs pursuant to those initial locally submitted tenders. Prior to GBL issuance, however, all of those tenders had either expired by their own terms, or, as is most often the case, plaintiff had cancelled them in the national database. There is no dispute that the Military Freight Traffic Unified Rules Publication ("MFTURP") permitted TSPs to cancel tenders and directed them to do so at the national level. *See* MFTURP-1 § A part IV (Pl.'s App. 26).[2]

Despite having cancelled the tender indicated on the GBL, Platinum fully performed by arranging for another carrier to transport the HHGs shipments, and in 12 instances, locally store those shipments until DOD was ready to accept delivery. After the shipments were delivered, Platinum billed DOD, not at the tender rates indicated in the GBLs created locally, but based on rates associated with remaining active tenders in the GFM system. DOD then sent those bills to its audit contractor, who declined to authorize any payment to Platinum because it could not verify the rates indicated on the GBLs.

II. Procedural History

Not having been paid, plaintiff filed suit here on November 5, 2019. The parties and the court then pursued the special procedures outlined in Appendix I to the court's rules for these common carrier cases. Prior to the completion of that process, defendant moved for remand of the case to the General Services Administration ("GSA') on December 20, 2019. We

---

[2] These provisions in the MFTURP are instructions to TSPs for filling out tenders and submitting them to the government. The GFM is referenced. Although the GFM system is not explicitly mentioned in the sections dealing with cancellation, it is clear that all of the instructions concerning tenders in this section are to be carried out at the national level with the Army's Surface Deployment and Distribution Command ("SDDC") or the Air Force's Air Mobility Command. The government does not dispute that plaintiff went through that process.

3

granted that motion and sent the matter to GSA on January 22, 2020. *See* Order Remanding Case (ECF No. 13).

Defendant then filed GSA's remand decision on August 10, 2020, and then a corrected decision on September 29, 2020 (ECF No. 22-1). GSA conducted extensive fact finding regarding the local shipping offices' practices and procedures for how they selected tenders for shipments. GSA also attempted to audit the GBLs by matching them with tenders. It was unable to do so following its normal rules (using the GFM), and instead relied on the shipping offices' collection of tenders submitted locally. The result was that GSA recommended Platinum be paid $811,062.27 for the shipments.[3] GSA Remand Decision at 9 (Sept. 25, 2020) (ECF No. 22-1). GSA declined to rely on the GFM because it determined that Platinum had acted in bad faith by cancelling its tenders without notice to the local shipping offices.

GSA also considered the 12 shipments for which Platinum billed the government for local storage near Tracy, California. It allowed only $1,000 of the $680,000 billed, citing a lack of evidence to support those charges. *Id.* at 10. The remand decision indicates that GSA found no evidence that the government had ordered storage services, no evidence that they were in fact necessary, and no evidence that the services were provided. *Id.* GSA concluded by stating that Platinum had used a "duplicitous business practice" by submitting offers locally and then cancelling them nationally without notice to the local offices. *Id.* at 11.

The remand process did not resolve the parties' dispute. Discovery commenced, which was followed by the filing of cross-motions for summary judgment. Plaintiff seeks $4,081,92227 for the services performed, including storage fees, at the rates associated with its tenders still active in the GFM at

---

[3] This includes 125 shipments ordered by a shipping office in Jacksonville, Florida at the rates billed by Platinum because, according to GSA, the billings matched the tenders on file in Jacksonville. Plaintiff agrees with GSA regarding these GBLs, but it has not yet been paid for them. *See* Pl.'s Mot. for Sum. J. 6 (ECF No. 42). GSA reached no conclusion as to 11 shipments that were originally issued to other TSPs and/or for which there was no tender indicated on the GBL or some other documentation was missing.

the time of performance. Defendant opposes and seeks summary judgment itself, asking the court to defer to GSA's methodology, and arguing that DOD was legally permitted to rely on the rates on file at the local offices. It also asserts that the accessorial fees (storage) were unnecessary and unauthorized.

After the conclusion of oral argument on those motions, held on October 19, 2022, the parties requested the court stay the case to allow them an opportunity to settle. The stay was lifted in January 2023 after the parties reported the failure of that process. We held supplemental oral arguments on April 18, 2023, and May 11, 2023. The matter is now ripe for resolution.

DISCUSSION

As we noted in the sister case, No. 18-1539, the GBLs are contracts. As in that case, however, plaintiff asserts that they are only the starting point. The fact that plaintiff submitted an offer to a shipping office, that the shipping office issued it a bill of lading accepting that offer, and that Platinum then fully performed without complaint or request to change the tender number, gives it no pause, because plaintiff does not view the tender referenced on the GBL as controlling. Plaintiff points to DTR part II as mandating that the GFM is the system of record from which shipping offices may select tenders. Thus, because the MFTURP directed TSPs to cancel any withdrawn tenders at the national level, which plaintiff did prior to performance, it views the tender reference on the GBLs as inoperative. It thus billed at the rates indicated on its active tenders (in the GFM system) and asks the court to award it approximately $4 million dollars pursuant to those tenders.

Defendant takes a different view of the DTR's tender management requirements and otherwise argues that plaintiff agreed to perform at the rates indicated on the GBLs. As to the accessorial services (storage), it avers that there is no evidence that those services were authorized and that plaintiff was responsible for avoiding the storage problem.

I. Standard of Review

The court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Material facts are those facts "that could 'affect the outcome' of the litigation." *Georgia Power C. v. United States*, 143 Fed.

5

Cl. 743, 746 (2019). The questions presented by the parties are largely legal. Where they are not, summary judgment is inappropriate. We begin with the question of what the DTR requires.

II. Defense Transport Regulation

The parties disagree as to what is mandated by the applicable regulations and how those regulations apply here. Plaintiff relies on DTR part II, which governs "cargo routing and movement", DTR Part II, ch. 202 (2016) (ECF No. 42-1), while defendant cites part IV, which governs the direct procurement method generally.

    A. DTR Part II

Plaintiff points us to DOD's rules for "worldwide cargo movement," which apply regardless of mode of transportation. *Id.* Chapter 202 directs transportation officers ("TOs") and their agents to use only "DoD-certified" TSPs that have active tenders on file "within the GFM system." *Id.* Ch. 202(B)(1). The regulation prescribes the use of the GFM system for shipping offices "with automated capabilities." *Id.* ch. 202(B)(1)(a). TOs without access to the GFM system are directed to "utilize the manual processing method" by maintaining "a complete file of authorized tenders for use in routing general commodity shipments obtained from SDDC." *Id.* ch. 202(B)(1)(b)(1). From these directives, plaintiff draws the conclusion that its cancellations were effective prior to the issuance of the GBLs because government shipping officials were instructed to use the GFM or obtain the tenders in the GFM from the SDDC.

    B. DTR Part IV

Part IV of the DTR governs the use of the DPM method. This method stands in contrast to, for example, the use of FAR-based contracting vehicles for the movement of goods. A feature of this method is that contractors other than the TSPs containerize and handle the HHGs prior to pick up by the TSPs. DPM contractors also deliver the HHGs to the service member's residence after the TSP has delivered to the destination listed on the GBL,

normally a government-controlled facility of some type. There is no dispute that the DPM method was used for the shipments at issue.[4]

Defendant points us to Chapter 404 of part IV, which applies to "all DPM household goods and unaccompanied baggage (UB) shipments when transportation services are acquired on the bill of lading (BL) or other shipping document." DTR Part IV, ch. 404(A) (2019) (ECF No. 46-2).[5] Defendant cites specifically to subsection C, which states that the shipping offices "determine[] the mode of transportation and the origin freight [TSP] for the movement of DPM shipments." *Id.* ch. 404(C). The government concludes from this provision that the TOs are granted discretion to route shipments from their respective shipping offices as they see fit. Seeing no mention of the GFM in Part IV, defendant argues that the shipping offices were within their rights to use their own local systems (eTOPs) as the database of tenders from which to select the appropriate TSPs for line haul service. Because plaintiff did not cancel its active tenders at the local level, defendant urges that those offers were available to be accepted, and were accepted, forming valid contracts that the court should now enforce.

    C.  Both provisions apply

Defendant argues that Chapter 404 supersedes 202 as it regards routing of these shipments because these are DPM shipments, and under the DPM method, the local shipping offices have the discretion to select the mode of transportation and TSP used. Plaintiff, on the other hand, sees no inherent contradiction between the chapters, and argues that both apply in full. Although the shipping offices have full discretion to select the type of

---

[4] One of other cases, No. 20-456, involves shipments for which the TSP provided origin and destination services normally handled by DPM contractors.

[5] Defendant submitted the 2019 version along with its motion for summary judgment. After a request from the court, the government provided copies of the earlier versions which would apply to many of the shipments at issue in this case. We cite to the 2019 version because there is no meaningful difference between the versions for those years and because it is available on the docket.

7

service (air, water, train, or truck) and who should provide it, they must select tenders via the GFM, per Chapter 202(B), says plaintiff.  We agree.

Chapter 404 does not supersede Chapter 202.  Chapter 404 provides additional clarity when the TOs are moving shipments of HHGs via the DPM method.  Most of part IV deals with the additional services performed by the non-TSP contractors.  Earlier, in subsection B, the regulation clarifies that the line-haul portion of the DPM method is provided by "common TSPs of freight."  *Id.* ch. 404(b).  We take that to mean that the TSP-provided portion of the DPM method is governed by the more general cargo routing provisions of Part II, such as Chapter 202.[6]

In sum, plaintiff is correct that the shipping offices here acted contrary to the applicable regulations.  They ought to have relied on the GFM database or have requested copies of the active tenders from SDDC.  This also means that plaintiff followed the rules and its cancellation of tenders was effective.  That leaves the question of the effect of these cancellations on the GBLs.

D. The GBLs

As mentioned above, plaintiff argues that the GBLs, although valid contractual agreements to move cargo from one location to another, are only a starting place.  It believes that, in these circumstances, the tender referenced on the GBL is not conclusive as to price.  It cites five administrative decisions, and one case from our predecessor, the United States Court of Claims, for the proposition that the tender listed on the GBL is not always controlling and that an inactive tender cannot be relied on.[7]  Platinum further

---

[6] We note also that GSA cited DTR part II in its decision.

[7] In *Mercury Van Lines, Inc. – Reconsideration*, B-193964, 1980 WL 16370 (Comp. Gen. June 27, 1980), the Government Accountability Office ("GAO") held that revocation of a tender ended the government's ability to accept that offer. *See also Tri-State Motor Transit Co.*, GSBCA No. 13746-RATE, 97-1 BCA ¶ 28951 (General Service's Board of Contract Appeals reformed the GBL to correct the reference to an inapplicable tender); *Matter of Airgroup Express*, 73 Comp. Gen. 231 (1994) (GAO finds that GSA's reliance on expired tenders was misplaced); *Starflight, Inc. – Reconsideration*, B-212279, 86-2 CPD ¶ 245 (Comp. Gen. Sept. 2, 1986) (following *Mercury Van Lines*, holding that a carrier could not be held to

offers the declaration of Mssrs. Norman Shifflett and Ronald Wilkinson, both of whom have extensive experience in the industry, including as auditors for GSA reviewing DPM billings. They offer the opinion that an expired or cancelled tender may not be relied upon by the government and that both DOD and GSA departed from their normal business practices in not authorizing payment to Platinum based on active tenders.[8] Neither individual, however, was involved with the shipments in this case.

Defendant counters that the cases cited by plaintiff are inapposite, largely because they do not concern the shipment of HHGs via the DPM method. The government again argues that deference is owed GSA concerning these matters and that the DTR does not otherwise prohibit the shipping offices from relying on their own collection of locally sourced tenders.

Both parties' reliance on experts uninvolved with these shipments is misplaced. We owe no deference to GSA in this matter because GSA was not applying its own regulations, largely did not rely on the DTR, conducted extensive fact finding, and ultimately came to a legal conclusion not tied to the narrower question of regulatory support for the government actions in question. *See generally W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 691-92 (2015) (discussing scenarios in which *Skidmore* deference might apply). Likewise, plaintiff's offer of expertise is unhelpful because its experts are opining on the legal question that the court must decide. We are thus left with general legal principles that dictate the result.

---

rates from tenders that had been effectively cancelled). In *United Van Lines, Inc. v. United States*, the Court of Claims found that a group of carriers' blanket revocation of active tenders was effective and meant that GSA could not reduce the amounts owed to United Van Lines based on its previously-revoked tenders. 173 Ct. Cl. 697 (1965).

[8] Plaintiff also submitted the declaration of its president, Mario Smoot, who states that, in his experience, tenders must be authorized and maintained by DOD at the GFM level, where they must also be cancelled by TSPs if they wish to do so. When Platinum billed for the 1,311 shipments at issue, it did so based on its active tenders in GFM as required by regulation and consistent with past practice, according to Mr. Smoot. *See* Pl.'s App. 1-4.

The aim of contract interpretation is to achieve, as best as possible in the autopsy-like setting of litigation, the parties' intent at the time of bargain. *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1362 (Fed. Cir. 2009). The tenders are offers to move HHGs from point A to point B for a price. Plaintiff submitted its offers to move these shipments at the national level in the GFM and locally via email and hard copy to the shipping offices. Plaintiff then cancelled those offers—or in some instances the tenders expired—at the national level but did not also notify the local offices. The local shipping offices, and the TOs involved, ignored the applicable regulations and relied solely on their own collection of tenders when selecting Platinum to move these shipments.

Platinum, receiving 1,311 GBLs, and apparently unconcerned with the cancelled tenders indicated on them, moved the HHGs successfully. After performance, it reconciled the shipments with its tenders still active in the GFM and billed accordingly. If plaintiff is correct, the regulatory scheme and course of practice (the post-performance audit) layer on top of the contracts themselves, creating a superstructure that can supply a new price even when the contract indicates a different price or will insert a price term when none is indicated on the GBL. If, on the other hand, defendant is correct, plaintiffs are bound to the terms of the GBLs despite the fact that they purport to accept offers that Platinum had already cancelled. Neither position is availing.

E.  Quantum Meruit

We hold that there was no meeting of the minds as to price for these shipments. A cancelled offer, or one that expired by its own terms, cannot be accepted by the offeree. *See* Restatement (Second) of Contracts § 35 (contract cannot be created by acceptance after power of acceptance has been terminated); § 36 (power of acceptance may be terminated by revocation of the offeror) (Am. L. Inst. 1981). Plaintiff's cancellation of its tenders in the GFM system was effective. Thus the GBLs subsequently issued to Platinum listing the withdrawn or expired tenders did not memorialize an agreement on price. That does not mean, however, that Platinum is entitled to be paid at the rates indicated in its other tenders that were still active in the GFM at the time of GBL issuance. There is no evidence or suggestion that the shipping offices knew of or had any intent to pay those prices.

10

Price is an essential term of a contract. *Keehn v. United States*, 110 Fed. Cl. 306, 327 (2013). Although there are instances in which a contract can be enforced even when it calls for the price term to be resolved later, here, no such agreement was in place. In usual circumstances, the post-performance audit will resolve these issues by ensuring that the GBLs match the proper active tenders for the services rendered. Here, however, where the parties were in effect relying on different systems of tender management, no meeting of the minds could have occurred, and therefore no valid contracts were in place to be audited by the agency or GSA. GSA, in fact, went far beyond the normal audit process of matching bills to contracts; it asserted a breach of good faith and fair dealing to avoid paying the rates plaintiff sought.

The court and the parties are thus left in the unenviable position of supplying a price where none was agreed on. The government believed it was buying the shipping services for the cancelled tender prices, and plaintiff assumed that the price terms would be corrected after performance to match its remaining active tenders. Neither assumption was correct. There was no meeting of the minds, and the contracts cannot be reformed to reflect one.[9] The only result for the vast majority of these shipments is a default to *quantum meruit* to find the reasonable value of the services rendered.

III. Storage Fees

A separate question arises as to payment for the storage services provided by Platinum when the government was unable to accept the 13 shipments to Tracy, California. We begin with our holding above. To the extent that the price term is missing, we will have to resort to *quantum meruit* to value the accessorial services. We must also consider, however, whether defendant's arguments unique to these shipments have merit.

Defendant argues that the storage fees were unauthorized because neither the shipping offices nor the receiving office were contacted ahead of time to obtain consent. Defendant's argument is essentially that Platinum should have avoided the problem, and if not able to, garnered government

---

[9] Nor has either party asked for reformation as a remedy.

11

assent to store the shipments locally.  Not having done so, it cannot recover the associated storage fees now, argues the government.

The government cites Appendix B to DTR Part IV, which states in paragraph 14 that TSPs will prepare a Statement of Accessorial Services Performed, including an itemization of such services when performed and separately charged.  It goes on to state that "[a]ll accessorial services must be requested and approved by the PPSO in DPS [(Defense Personal Property System)]."  DTR Part IV, Appx. B ¶ 14 (2016).[10]  Defendant avers that the shipping offices (PPSOs) did not request these services nor approve them.  The conclusion is thus that the charges are unapproved.

Plaintiff counters with MFTURP-1, wherein the SDDC tells TSPs that "freight held in possession of the TSP by reason of an act or omission of the consignor, consignee or owner . . . or for any reason not the fault of the TSP, shall be considered stored."  MFTURP-1 § A(I)(1) (2016) (ECF No. 42-1 at 27).  There is no dispute, other than defendant's urging that plaintiff ought to have warned it of the problem, that it was not Platinum's fault that the government was not able to accept these shipments when they arrived in California.  Plaintiff thus argues that it could not have acquired approval prior to shipment because it did not know that the government facility at the destination would be unable to timely accept delivery.  DTR Part IV's Appendix B thus ought not apply in these circumstances, avers Platinum.

As in case No. 18-1539, we apply a rule of reason, attempting to give both provisions meaning and effect and to avoid anomalous or absurd results.  *Frazier v. McDonough*, 66 F. 4th 1353, 1358 (Fed. Cir. 2023) (regulations should be construed to avoid absurd or anomalous results); *Silverman v. Eastrich Multiple Inv. Fund, L.P.*, 51 F.3d 28, 31 (3rd Cir. 1995) (regulatory construction should give effect to all provisions so that none are rendered void or superfluous).  Plaintiff is correct, in the abstract, that it could not have obtained prior approval for accessorial storage fees at the time of shipment because it was not on notice of the government's inability to accept the HHGs at their destination.  We thus decline to apply Appendix B of DTR Part IV in the manner suggested by defendant.  Whether, at some point after the

---

[10] Although defendant cited this provision, it did not supply a copy of Appendix B.  The court was able to independently locate the 2016 version.  We thus cite to that version.

problem was apparent, plaintiff ought to have notified the shipping offices is an open factual question. That issue has not been fully explored by the parties' briefing nor do we think all fact questions are resolved in this regard. The issue remains for trial.

We note further that, though plaintiff may ultimately recover for some or all of the storage services it rendered, it will not do so at the tender rates it seeks unless those particular shipments were the subject of GBLs on which active tenders were referenced. If not, the value of those services also will be determined at trial under the principle of *quantum meruit*.

IV. The Result

For the most part, the parties failed to achieve a meeting of the minds on price. There are, however, 125 shipments for which an active tender was listed on the GBL. For those, plaintiff is entitled to recover what it billed. For all of the others, including the shipments originally issued to other carriers, a trial to determine the reasonable value of plaintiff's performance is necessary. Trial will also include the issue of whether plaintiff knew, or should have, of the delivery issues at the Tracy, California destination and thus should have sought clarification or approval from the shipping office(s) for storage fees. The value of any storage services will also be resolved at trial.

## CONCLUSION

For the foregoing reasons, the following is ordered:

1. Plaintiff's motion for summary judgment is granted as to the shipments for which the GBL listed an active tender. It is denied in all other respects.

2. Defendant's motion for summary judgment is denied.

3. The parties are directed to file a joint status report on or before November 6, 2023, regarding their proposed pretrial schedule.

s/Eric G. Brugggink
Eric G. Bruggink
Senior Judge